# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1. I, Christopher J. White, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state:

2. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since January 19, 2010. I am currently assigned to the Portland, Maine Resident Agency. My current assignment includes national security investigations. Throughout my career I have been involved in various investigations that have included economic espionage, theft of trade secrets, fraud, online threats, violent crime, and other counterintelligence and counterterrorism investigations. In this assignment and previous assignments on national security squads with the FBI, I have initiated and led numerous felony related investigations. I am familiar with and have participated in all regular methods of investigation, including, but not limited to, conducting searches, including searches involving computers, cellular telephones, and other data-storage devices, interviewing of witnesses and victims, the execution of search and arrest warrants, the use of confidential human sources, the use of Grand Jury, and the search and review of social media activity. Additionally, I have consulted with other Agents and officers who have been involved in similar investigations. As a Special Agent, I am a federal law enforcement officer under applicable provisions of the United States Code and the Federal Rules of Criminal Procedure. I have received training and have experience in the enforcement of the laws of the United States, including laws related to espionage, fraud, theft, threats, terrorism, conspiracy, and other related offenses.

3. This affidavit is intended to show only that there is sufficient probable cause for the complaint. The facts set forth in this affidavit are based on my personal

knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and records related to this investigation, and information gained through my training and experience.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Terry Liu stole property of the United States in violation of 18 U.S.C. § 641, and damaged property of the United States in violation of 18 U.S.C. § 1361.

5. On January 7, 2026, Customs and Border Protection (CBP) Office of Professional Responsibility (OPR) personnel provided that Terry Liu ("Liu"), born in year 1987, was the subject of an internal investigation related to various actions taken while on duty and in his official capacity. Liu was a CBP Supervisor assigned to the U.S. Customs and Border Protection – Calais (Maine) Port of Entry ("CPOE").

6. CBP OPR provided that Liu became a subject of interest based on several actions regarding computer-related access. Specifically, on or around December 19, 2025, CBP IT personnel became aware that multiple computers located at the CPOE had been modified outside of regularly scheduled maintenance and not at the direction of CBP management or IT personnel. A review of computers located at the CPOE identified that approximately twenty-three (23) computers had been modified. The modifications included original hardware such as Computer Processing Units (hereinafter CPU or CPUs), Random Access Memory (hereinafter RAM), and hard-drives being swapped out for non-compliant hardware. Many of these computers were connected back to the CBP network.

7. On or around December 19, 2025, review of internal cameras located inside CPOE by CBP personnel captured Liu taking a computer from a workstation to a training room which did not have camera coverage, and then back to the office area.

8. On or about January 6, 2026, CBP installed a camera in the training room at a location that captured Liu making alterations to several computers.

9. A review of the internal camera located at the CPOE and the newly installed camera observed the following activity on January 9, 2026:

a. 12:00 AM – Liu was observed in the Commercial Waiting Room. Liu removed a computer from the far left workstation (from the camera's perspective) at the CBP desk and left the camera view.

b. 12:02 AM - Liu was observed entering the facility training room with a computer tower. Liu immediately departed.

c. 12:07 AM – An individual matching Liu's description was observed behind the International Business Processing Counter.

d. 12:08 AM - Liu returned to the training room with a second computer and placed it on a desk, next to the previous computer. Liu removed the side access panel of both computers. Liu departed the room at 12:09 AM.

e. 12:10 AM - Liu returned to the training room with what appeared to be a screwdriver and a small item resembling a CPU and began removing components from one of the computers. Liu removed the CPU from the computer and appeared to scrape the back of it. (Note: I know from knowledge and experience that CPUs often have a thermal paste covering their backs. This paste is used to ensure heat conductivity from the CPU to the fan that is installed over it. The observed activity was consistent with Liu removing a CPU.) Liu

replaced the CPU from the computer with the one he brought into the training room, after which he re-installed the other components of the computer. (See image below.)



f. 12:16 AM – Liu used a similar procedure and removed several components from the second computer and then removed the CPU. Liu departed the training room with the CPU, returning a minute later. Liu utilized the CPU from the original computer and installed it into the second computer. Liu re-installed the access panel to the second computer, then gathered the CPU removed from the second computer and left the room with it.

g. 12:21 AM – Liu returned to the training room empty-handed. Liu installed the side access panel on the first computer and connected a monitor, a mouse, and a keyboard to it. Liu booted the computer.

h. 12:24 AM – Liu connected a network cable and appeared to log into the device using his government ID. Liu accessed the computer for several minutes. The observed activity was consistent with Liu testing whether the computers were still functional following the modifications.

i. 12:31 AM – Liu pulled out a cell phone and appeared to reference it while typing on the first computer.

j. 12:35 AM – Liu switched the monitor, mouse, keyboard, and network cable from the first computer over to the second computer. Liu watched the computer boot up.

k. 12:37 AM – Liu reconnected the monitor, mouse, keyboard, and network cable back to the computer tower that was originally at the workstation.

l. 12:38 AM – Liu gathered the second computer and departed the room.

m. 12:38 AM – An individual matching Liu's description appeared in the rear row of the International Business Processing Counter carrying an object. The individual went into another portion of the port on the left side of the camera view.

n. 12:46 AM – Liu returned to the training room, gathered the first computer, and departed the room.

o. 12:47 AM – Liu arrived in the International Commercial Waiting Room with a computer. Liu placed the computer on the workstation on the left side, where he previously removed a computer. Liu connected the computer and booted it up.

p. 12:57 AM – Liu removed another computer from the far left workstation and departed the area.

q. 12:58 AM – Liu returned to the training room with yet another computer and proceeded to remove the CPU of this this computer, and replace it with another CPU in a similar fashion as previously described.

10. On or about March 4, 2026, an additional camera was installed above Liu's assigned desk space in the supervisor office area. There were several supervisor desks located in the supervisor's office area and the camera was positioned to capture activity at Liu's assigned desk.

11. A review of camera footage from March 15, 2026, captured the following observations:

a. 1:34 AM – Internal camera footage captured Liu returning to his desk with a computer tower. Liu was seen opening up the computer and removing several components, including what appears to be a module of RAM. Liu placed the RAM in his desk drawer.

b. 1:41 AM – Liu replaced the access panel to the computer and departed the desk space with the computer. Shortly after Liu departed his office, CCTV footage captured him entering the facility's server room with a computer tower. Liu placed the computer on a folding table in the server room. Two computer towers and a Dell laptop were already on the table. Liu then attached a monitor, keyboard, mouse, and network cable to the tower he brought in. Liu then turned on the computer and then departed.

12. I know from my knowledge and experience that computer towers often have two RAM modules. One RAM module can be removed, and the computer will still function, however the computer will have a degraded processing capacity.

13. None of the above identified alterations were ordered or authorized by CBP IT Systems Manager as would be required for such devices that are connected to controlled government systems.

14. While meeting with CBP Officials at the CPOE on February 12, 2026, the Assistant Port Director opened one of the desk drawers associated with Liu's desk. Two photographs were taken of the open drawer. The photographs identify at least three (3) CPUs and other computer parts in the drawer. Additionally, a screwdriver matching the description of the one that was utilized on January 9, 2026, was also visible.

15. A review of a computer hardware inventory spreadsheet provided by CBP IT personnel on or about August 26, 2026, for computers located at the CPOE, U.S. Customs and Border Protection Milltown Port of Entry ("MPOE") and U.S. Customs and Border Protection Ferry Point Port of Entry ("FPPOE") identified multiple computers at each location that had been modified. Since late 2025, forty-six (46) computers had been modified without authorization of CBP IT System Managers. In September 2026, CBP IT personnel confirmed that CBP owned and controlled all forty-six (46) computers. Of those computers, thirty-nine (39) had CPUs replaced, six (6) had RAM changed, and eight (8) had hard drives changed. Some computers underwent multiple manipulations, such as both CPU and RAM replacements, or both CPU and hard drive modifications. In certain cases, CPUs were replaced more than once (for example, a CPU was changed and then replaced again by relocating CPUs). Thirty-eight (38) computers were modified at the CPOE, six (6) computers were modified at the FPPOE, and two (2)

computers were modified at the MPOE. Liu had access to and responsibilities for all locations as a supervisor. During "midnight" shifts there was typically only one (1) supervisor assigned to cover all open ports in the area. During the midnight shift at the CPOE, all traffic is directed to the "cargo" side of the port. This area is distinctive from the "passenger" side of the port where Liu's assigned desk was located. According to CBP Port management, this meant that Liu would expect not to encounter the officers working at that time as they would be located in the cargo side of the port. CBP Port management provided that Liu would sometimes visit other ports during his assigned shift. All three locations are located in or near Calais, Maine.

16. CBP IT personnel provided a monetary damage estimate for the forty-six (46) computers which had been modified outside of CBP Policy. To replace the parts that were modified back to original parts would cost an estimated $20,460.00. To replace all forty-six (46) modified computers with new computers, an estimated cost would be $105,800.00 based on a per computer cost from the Dell website. These estimates do not include additional costs required for installation of DHS/CBP specific hardware or software, administrative or installation costs associated with bringing device into compliance with federal government usage and networks.

17. As a supervisor, Liu was authorized to perform limited IT responsibilities at all three POEs. However, these responsibilities did not include computer modification. In fact, Liu was counseled about not modifying computers by a Port Director. On March 18, 2025, Port Director Theodore Cummings documented the following guidance in an email to Liu following a prior discussion:

a. "This is just a reminder of our discussion today. Please do not move any computers or computer parts. Sentrillion equipment doesn't belong to CBP.

We cannot touch these at all. CBP computers are to be maintained by CBP OIT. I do appreciate the intent but we should stay in our lane and report deficiencies through the work ticket process."

b. In September 2026, CBP IT personnel confirmed that all the computers modified by Liu were owned and controlled by CBP. Sentrillion has a contract to maintain and fix the security camera system utilized by CBP at the ports.

18. Despite this counseling Liu did in fact "move" computer parts multiple times over the following year, as noted above.

19. Per CBP IT personnel, computers located at CPOE, MPOE and FPPOE were equipped with 14th Generation Intel Core CPUs. A review of the computer hardware inventory identified that many of the altered computers had their CPUs changed to 12th Generation Intel Core CPUs, 13th Generation Intel Core CPUs, or Intel Pentium CPUs.

20. A review of internet browser history data by Liu on the CBP network from December 11, 2025, to March 10, 2026 provided that Liu accessed the website Newegg.com at least thirty-eight (38) times in that review period. The Newegg.com website describes the company as follows:

21. "...Newegg is an online electronics store based in North America. Its global reach as a go-to tech store expands into Europe, South America, Asia Pacific, and the Middle East..." and consumers can "...Discover an expansive selection of PC components, consumer electronics, smart home devices, and gaming products on our trusted online platform..."

22. Liu's browser history indicates that he visited the following webpages associated with Intel products, shopping cart and purchase history from Newegg.com on at least the following dates:

a. December 11, 2025 – Intel Core i3-13100 (13th Generation Intel Core), Newegg.com Shopping cart, and Newegg.com Order History

b. December 14, 2025 – Intel Core i3-12100F (12th Generation Intel Core), Intel Pentium G7400 and Newegg.com Shopping Cart

c. December 15, 2025 – Intel Core i3-12100F, Intel Pentium G7400, Intel Core ie-14100F (14th General Intel Core), and Newegg.com Shopping Cart

d. December 16, 2025 – Intel Pentium G7400

23. In addition to the above Newegg.com webpages, Liu visited webpages for various computer parts including storage options, specifically RAM.

24. Liu's browser history indicates that he visited Amazon.com and viewed webpages associated with various computer parts to include Intel parts. A review of Amazon order history information indicated that Liu placed hundreds of orders with Amazon between January 4, 2023, and February 18, 2026.

25. United States Postal Service ("USPS") provided information that Liu received packages from Newegg.com and Amazon at his two residences, one of which is located at Liu's residence in New Hampshire and the other is located at his residence in Calais, Maine. USPS information provided that Liu received Newegg.com packages in New Hampshire on December 12, 2025, and December 17, 2025. Liu received an Amazon package at his residence in New Hampshire on November 11, 2025. Liu received a Newegg.com package at his Maine residence on October 13, 2025, and

Amazon packages on March 1, 2025, April 15, 2025, May 15, 2025, July 10, 2025, November 7, 2025, November 10, 2025, November 13, 2025, and January 3, 2026.

26. According to the Newegg.com website, they offer a trade-in program for GPU (Graphics Processing Unit), CPU, and RAM items. The trade-in program requires the purchase of a new GPU, CPU, or RAM items. Per the website, a trade-in participant fills out a "Trade-in submission form", and once the new transaction is completed a prepaid UPS shipping label will be sent to via email. Per the website, once Newegg.com receives, reviews, and accepts the trade-in, the customer would receive a credit for the trade-in.

27. CBP identified thirteen (13) emails between May 21, 2025, and January 26, 2026, that Liu sent from one of his personal email addresses to his official CBP email that contained UPS shipping labels to Newegg.com. The emails also provided a "Newegg Trade-In Summary" for the item. All thirteen (13) emails had one item associated with the trade-in and all thirteen items were listed as "Intel – 14700". This item description was consistent with 14th Generation Intel Core CPUs, the CPUs which were missing from 38 CBP computers. Six (6) emails provided the "Trade-In Offer" value as $210.00 per item and seven (7) emails provided the value as $200.00 per item. The return address associated with UPS shipping labels included both his Calais, Maine and Mason, New Hampshire residences.

28. A review of financial records obtained from American Express provided that on January 15, 2026, February 2, 2026, and February 11, 2026, Liu received a $200.00 credit associated with "Newegg, Inc." on a Delta SkyMiles Platinum credit card.

29. On December 18, 2025, CBP personnel identified a Dell Precision 3460 computer with Service Tag 4H6DCW3 sticker on the computer. Per CBP, this computer had been located in the Training Room and had the CPU and hard-drive changed without authorization.

30. On April 25, 2026, FBI personnel entered the service tag number for this computer on the Dell.com product support website. This provided the "device's original configuration and the system specifications it shipped with." A review of the product specifications identified that the configuration included the "Approved Bid Use Intel Core i7-14700...". Review of the Intel website provided that "Intel – 14700" referred to the "Intel Core i7 processor 14700" and was part of the product collection "Intel Core i7 Processors (14th gen)". Further review of the specification identified that the computer was sent with two (2) 16GM RAM components for 32GM of total RAM and a 1TB hard-drive. From discussions with CBP IT personnel these specifications were standard issue for computer purchased by CBP for CPOE, MPOE, and FPPOE.

31. Further review of the computer hardware inventory spreadsheet compiled by CBP IT personnel provided that computers with modified RAM did not have the 32GB standard RAM installed. Additionally, computers that had the hard-drives changed did not have the 1TB capacity that was standard.

32. CBP IT personnel provided that computers that were modified by Liu did not have any hardware changes made to them by IT personnel before the computers were installed and utilized in the field.

33. Records obtained from Newegg provided that Liu had one account that was open as of March 2026.

34. Records obtained from Newegg identified that Liu ordered several Intel CPU components between May 9, 2025, and March 16, 2026. Some of these components match the CPUs that were installed in the modified computers. Additionally, Newegg records identified that Liu received credit for trade-in of Intel Core i7 14th Generation CPUs sixteen (16) times between May 8, 2025, and July 24, 2026. Liu was invoiced for the following Intel CPUs:

| Date | CPU(s) |
|---|---|
| 5/9/2025 | Intel Core Ultra 7 |
| 5/14/2025 | Intel Core Ultra 7 |
| 7/21/2025 | Intel Core i3 12th Generation |
| 8/4/2025 | (2) Intel Core i3 12th Generation |
| 8/20/2025 | (2) Intel Core i3 12th Generation |
| 9/1/2025 | Intel Core i9 14th Generation |
| 11/19/2025 | Intel Core i3 12th Generation<br>Intel Core Ultra 5 |
| 12/5/2025 | (2) Intel Pentium Gold |
| 12/28/2025 | Intel Pentium Gold<br>Intel Core i3 14th Generation |
| 1/27/2026 | Intel Core Ultra 5<br>Intel Core i3 12th Generation<br>Intel Pentium Gold |
| 2/10/2026 | Intel Core i3 12th Generation<br>Intel Core i3 14th Generation |
| 3/16/2026 | Intel Core i3 14th Generation |

35. Records from UPS provided that Liu received five (5) shipments from Newegg between January 30, 2026, and July 31, 2026. Specifically, Liu received four (4) UPS shipments from Newegg at his New Hampshire residence on January 30, 2026, February 2, 2026, March 23, 2026, and July 31, 2026. Liu received one (1) UPS shipment from Newegg at his Maine residence on February 17, 2026. Newegg records provided that Liu ordered computer components on July 24, 2026, and August 17, 2026 with shipment to his New Hampshire residence.

36. Records obtained from Amazon provided that between April 8, 2023, and February 12, 2026, Liu made several purchases of computer related components, tools and materials. These items were shipped to both his Maine and New Hampshire residences. Between February 7, 2025, and August 9, 2025, Liu ordered the following Intel CPUs from Amazon:

| Date | CPU(s) |
|---|---|
| 2/7/2025 | Intel Core i3 12th Generation |
| 2/14/2025 | Intel Core i3 12th Generation |
| 3/4/2025 | Intel Core i3 13th Generation<br>Intel Core i3 12th Generation |
| 3/25/2025 | Intel Core i3 14th Generation |
| 4/28/2025 | (2) Intel Core i3 12th Generation |
| 8/8/2025 | (2) Intel Core i3 13th Generation |
| 8/9/2025 | Intel Core i3 12th Generation |

37. During an interview on September 9, 2026, Liu admitted to replacing CBP computer parts with older model parts that did not meet CBP specifications, and that were purchased from Newegg and Amazon. Additionally, he admitted to using CBP computer parts for the Newegg trade-in program, in which he received credit. The parts sent for the trade-in program were shipped via FedEx from the CPOE with labels provided by Newegg. In initially defending his actions, Liu stated that he made these changes in order for the computers to operate more efficiently. Later during the interview when further questioned, Liu admitted that he knew that the changes made degraded the CBP computer system efficiency and claimed he do so because he was angry with how long it took for CBP IT systems to be repaired.

38. Based on the above affidavit, your affiant asserts there is probable cause that Liu willfully and knowingly stole government property in violation of 18 U.S.C. 641 and damaged government property in violation of 18 U.S.C. 1361.

Respectfully submitted,

Christopher J. White
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this ___ day of September 2026.

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Sep 10 2026

Judge's signature

City and state: Bangor, ME

John C Nivison U.S. Magistrate Judge
Printed name and title